UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CRIMINAL NO. 11-10226-PBS |
| RAYMOND MARTINEZ, | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

January 23, 2012

Saris, U.S.D.J.

**I. Introduction**

Defendant Raymond Martinez moves to suppress the firearm and ammunition seized from his person during a traffic stop on April 14, 2011. After an evidentiary hearing at which Officer Robert Lewis, Detective Matthew Gutwill, Sergeant Kathryn Esposito, Ms. Trinity Font, and Defendant Raymond Martinez testified, the motion to suppress is **DENIED**.

**II. Findings of Fact**

On April 10, 2011, two members of the Latin Kings were shot to death as they sat in a car in Worcester. The wake for one of the victims was scheduled for 4:00 P.M. on April 14, 2011, at a Framingham church. Framingham police officer Robert Lewis, who had learned of the shooting and wake, informed other officers of the wake at roll call before their 4:00 P.M. shift on April 14

and advised them there was a heightened risk for gang violence in the area.  Multiple officers, including Officer Lewis and Detective Matthew Gutwill, were assigned to monitor the area around the church where the wake was held to prevent any sort of retaliation or violence.

Not long after the wake concluded, Detective Gutwill drove by nearby Roosevelt Park and observed a number of cars and people congregating there.  The park was located close to an address where police believed people who had attended the wake would congregate after the wake concluded, but Detective Gutwill did not at that time recognize any of the people he saw as members of a gang.  Detective Gutwill relayed his observation to a dispatcher over police radio and, according to Officer Lewis, expressed concern that "something wasn't right."

Officer Lewis responded to Detective Gutwill's report by driving to the park.  When Officer Lewis arrived, he saw two marked police cars approach the park and then noticed a silver car leave.  As the Defendant and Ms. Trinity Font, who was with the Defendant at the park, testified, they decided to leave the park when the Defendant saw two police cruisers arrive.  The Defendant explained that they left to avoid any confrontation with police.  Officer Lewis testified that their car left abruptly at a high rate of speed with its tires screeching; and that he followed the car and saw it go through a red light.  The

Defendant, however, testified the car was pulled over after going through a green light, and Ms. Trinity Font, who was in the backseat of the car and is the mother of a child of one of the two slain Latin Kings members, testified the light was yellow as the car passed through the intersection.  I credit Officer Lewis' testimony, which is consistent with his police report, that he observed the car go through a red light.  Officer Lewis then activated the lights on his vehicle to signal the silver car to pull over.  Although he normally does not do so, he notified a police dispatcher that he was conducting a traffic stop, and sought backup. Officer Lewis was concerned because the car abruptly left the park when police cruisers arrived.

When he approached the car, Officer Lewis observed four people inside the vehicle reaching in different places and moving around.  He recognized the front-seat passenger as Raymond Martinez, the Defendant, whom he had met before and knew to be a member of the Blood gang and to have previously been charged with assault and battery and dangerous weapons offenses.  The Defendant's presence and the movement in the car concerned Officer Lewis and made him nervous.  Consequently, Officer Lewis instructed the car's occupants through the open driver's window to keep their hands where he could see them.  The backseat passengers put their hands on the back of the headrests of the seats in front of them, and the Defendant put his hands on the front dashboard.

3

Officer Lewis then asked the driver for his license and registration. The driver explained he did not have them and identified himself as Michael Tisme. Officer Lewis recognized that name as belonging to a member of the Blood gang. He then informed Mr. Tisme that he smelled marijuana in the car and that he wanted Mr. Tisme to exit the vehicle so he could place him under arrest.

At that time, Officer Lewis saw the Defendant pull his hands off the dashboard and reach toward his waist. He yelled at the Defendant to put his hands back up on the dashboard, which he did. While Officer Lewis removed Mr. Tisme from the car, he heard the Defendant exclaim, "Oh, fuck!" Officer Lewis then conducted a pat search of Mr. Tisme and found a bag of marijuana in his pocket.

Detective Gutwill arrived on the scene. Officer Lewis informed Detective Gutwill that the Defendant appeared nervous and had been pulling his hands toward his waist. He asked Detective Gutwill to watch the Defendant. Detective Gutwill then observed the Defendant moving his hands toward his waist and repeatedly instructed the Defendant to return his hands to the dashboard. When Officer Lewis and Detective Gutwill instructed him to place his hands on the dashboard, the Defendant instead reached for his cellular phone, placed a phone call, and shortly thereafter hung up the phone. Officer Lewis and Detective Gutwill testified they did not see the Defendant using a cellular

4

telephone. However, the Defendant's testimony was corroborated by that of backseat passenger Trinity Font, by the fact that officers recovered the Defendant's cellular phone from the scene that night, and by the cellular telephone records in Exhibit 9, which indicate an outgoing call with a duration of twelve seconds was placed by the Defendant's cellular phone on 4/14/11 at 21:22:11, shortly after the car was stopped.[1]

Sergeant Kathryn Esposito arrived shortly after Detective Gutwill and heard him repeatedly ordering the Defendant to keep his hands on the dashboard. Detective Gutwill instructed Sergeant Esposito to remove the Defendant from the car because the Defendant was reaching for his waistband. Sergeant Esposito removed the Defendant from the car, walked him to Detective Gutwill's nearby vehicle, ordered him to put his hands on the vehicle and spread his feet, asked if he had any weapons on him but did not receive a response, and conducted a pat frisk of the Defendant. As she started to search the Defendant's waistband area, Sergeant Esposito noticed a hard object that felt like the butt of a gun. She asked the Defendant, "What's this?" He didn't respond, so she told him not to move and then pulled the object from his waistband. It was a loaded firearm. The Defendant and Mr. Tisme were placed in handcuffs, and Mr. Tisme

---

[1] The first page of the Framingham Police Department Incident Report, Exhibit 6, indicates the incident began at 21:21 on 4/14/11, which is shortly before the call was placed from the Defendant's phone at 21:22:11.

was issued a citation for operating a motor vehicle without a license and a red light violation.

### III. Discussion

The Defendant argues the search and seizure of his person violated the Fourth Amendment because the police lied about the traffic violation.

The First Circuit has recently discussed the law relating to traffic stops:

> An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else . . . . He can then order the occupants out of the auto . . . . And if he has some articulable, reasonable suspicion that the persons stopped may be dangerous, he can pat them down and search the car's interior—including closed compartments—for weapons that they could quickly lay their hands on.

United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) (internal citations omitted).

**A. The Stop**

Here Officer Lewis observed the car go through a red light. Defendant's testimony that the light was green the whole time is simply not credible, in light of Tiffany Font's testimony, and the traffic ticket that followed. Even if the real purpose of the stop was to check out possible gang-related activity, the stop of the car was lawful so long as a traffic violation occurred. See Whren v. United States, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a

traffic violation has occurred.").

**B.   The Order to Get Out**

The detention of the defendant was also lawful. Even after Mr. Tisme had been taken out of the car, it was permissible for officers to order the other occupants, including the Defendant, out of the car pending the completion of the stop. See Maryland v. Wilson, 519 U.S. 408, 415 (1997) ("We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.")

**C.   The Frisk**

The frisk of the Defendant for weapons after he was removed from the car was permissible if the officers had some articulable, reasonable suspicion that he may be armed and dangerous. See id. To determine whether an officer had articulable, reasonable suspicion, it is helpful to consider whether "the protective search [was] reasonably related to the events justifying the stop, factoring in what happened and what he learned during the encounter" as well as whether there was "an objectively reasonable basis to suspect that weapons were present" and "the officer in fact entertain[ed] such a suspicion." Id. The First Circuit has further explained that "context matters, and we must take a practical approach to all of this, keeping in mind the totality of the circumstances as seen and interpreted by the police at the scene." Id. Furthermore, "where law enforcement officers are jointly involved in executing

7

an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop." United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002).

Here, a consideration of the context and the totality of the circumstances indicates the officers did have an articulable, reasonable suspicion that the Defendant may be armed and dangerous. First, the officers knew that a wake for a murdered Latin Kings gang member had taken place that evening not far away and had been warned there was an increased risk for gang violence in the area that night. They also recognized the Defendant and driver Michael Tisme as members of the Blood gang and knew the Defendant had previously been charged with assault and battery and dangerous weapons offenses. See United States v. Osborne, 326 F.3d 274, 278 (1st Cir. 2003) (agreeing with the district court's conclusion that an officer had reasonable suspicion to justify a frisk where "[t]his was not a case involving an unknown suspect [and] Fratalia had specific information that Osbourne was 'always' armed with a semi-automatic weapon and was a member of a violent street gang."). In addition, after Detective Gutwill expressed concern regarding the group of people he observed at Roosevelt Park, Officer Lewis saw the car leave the park as soon as police cruisers arrived.

As he approached the car, Officer Lewis observed four people inside the vehicle reaching in different places and moving around, which suggested they might have weapons and made Officer

Lewis nervous.  Significantly, the Defendant disobeyed the officers' orders to keep his hands on the dashboard and instead reached toward his waist.  Although I credit the Defendant's testimony that when he was instructed to keep his hands on the dashboard he instead reached for his cellular telephone to place a short call and then hung up the phone, the officers testified they did not see him holding a phone and could reasonably have believed he was reaching for a weapon from his waist when he was actually reaching for a phone.  Moreover, the Defendant exclaimed "oh fuck!" when Mr. Tisme was removed from the vehicle.  Given the totality of the circumstances, the police had legitimate concerns for their safety.

The Defendant's reliance on United States v. McKoy, 428 F.3d 38 (1st Cir. 2005), is misplaced.  In that case, the First Circuit "held that officers infringed a defendant's Fourth Amendment rights when the totality of the circumstances did not support a reasonable suspicion that the defendant posed a threat to their safety . . . .  There, the police relied solely on the area's dangerousness and the defendant's apparent nervousness to ground reasonable suspicion."  United States v. Ruidiaz, 529 F.3d 25, 33 (1st Cir. 2008).  In this case, however, officers did not rely solely on the Defendant's apparent nervousness; instead, they were aware of the numerous other salient facts described above supporting reasonable suspicion.  The frisk of the Defendant was consequently lawful.

**ORDER**

The motion to suppress (Docket No. 17) is **DENIED.**

                                          /s/ PATTI B. SARIS
                                          PATTI B. SARIS
                                          United States District Judge